FILED
JAN 20 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INTERMARKET OVERSEAS FOR GENERAL TRADING, EST., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 06-50 C |

## COMPLAINT

1. This is an appeal of a final decision of the contracting officer terminating for cause a contract between Plaintiff INTERMARKET OVERSEAS FOR GENERAL TRADING, EST. ("INTERMARKET") and the United States of America. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq. ("Contract Disputes Act").

## PARTIES

2. Plaintiff INTERMARKET is an establishment organized and existing under the laws of the State of Kuwait, with its principal place of business in Safat, Kuwait.

3. Defendant is the United States of America ("Government") acting, *inter alia*, by and through its Department of the Navy.

## SUMMARY OF FACTS

4. On June 8, 2003, INTERMARKET provided to the Kuwait Ministry of Defense ("KMOD") a proposal for the production, storage and delivery of bags of packaged ice cubes. INTERMARKET proposed to construct and operate two production facilities and four storage facilities on military bases operated by Kuwait or the United States and located within Kuwait.

The proposal called for the buildings and equipment to become the property of KMOD at the end of the contract. KMOD was to provide certain foundations for the buildings, as well as all electrical power and water to operate the equipment.

5. In response to INTERMARKET's proposal, the Government on April 1, 2004, awarded to INTERMARKET a foreign military sales Contract No. N49400-04-C-A017 for the production and delivery of packaged ice for KMOD (the "Contract").

6. The Contract included two CLINs. CLIN 0001 was for INTERMARKET to produce and deliver to various military installations in Kuwait 43,800,000 4-kg bags of packaged ice on behalf of the KMOD for use by U.S. troops stationed in Kuwait at a rate of 40,000 bags per day for three years. The total price for CLIN 0001 was $9,679,800. CLIN 0002 was for INTERMARKET to perform water sanitation testing of the water used in production of the ice. The total price for CLIN 0002 was $18,000.

7. As proposed, the Contract called for INTERMARKET to provide all required plant, facilities, and equipment for the production of the ice. The plant, facilities and equipment were to be located on specified military bases.

8. No payment was to be made to INTERMARKET for the plant and equipment at the time of their construction and installation. Rather INTERMARKET was to be compensated for these costs through the payment for delivered ice. Since INTERMARKET could not recoup its capital investment until ice deliveries began, it was critical to INTERMARKET that deliveries begin as soon as possible.

9. The Contract provided that deliveries of ice were to commence "within approximately six (6) months from the date of award and KMOD's acceptance of facilities." The six month period was to provide INTERMARKET time to construct and test the plant and equipment. Upon KMOD acceptance of the facilities, the Contracting Officer was to issue a Notice to Proceed.

10. Interference with INTERMARKET's performance began immediately. Locations for construction and installation of the required plant and equipment were not made available on the designated military bases, preventing INTERMARKET from beginning work. The initial

delay was recognized in Modification P00002 to the Contract which amended the schedule for delivery of ice to six months from 01 June 2004, rather than the original six months from 01 April 2004.

11. Notwithstanding this modification, only one site for production was provided to INTERMARKET at that time. While the Contract provided for production facilities to be located at the SUBHAN-J4 Logistics Camp, and the SUPCOM Support Command Camp, in early 2004 INTERMARKET was notified that the SUPCOM facility would instead be located at the Ali Salem Base. No location for construction of the ice production plant was ever made available at Ali Salem, however, and on December 29, 2004, INTERMARKET was notified that the second production facility was being moved back to the SUPCOM Camp. Access to that location was finally provided to INTERMARKET in January 2005, but the designated site was full of military scrap equipment which required removal by the military authorities prior to commencement of work on the ice plant. Finally, in early March 2005, the SUPCOM site was available for the contractor to begin work.

12. By January 2005, the first production facility at SUBHAN Camp was complete and all equipment was installed. INTERMARKET could not begin testing of the equipment, water testing, or ice production however because KMOD failed to provide the necessary electrical power and water. This failure to provide electrical power and water was an ongoing problem and the subject of frequent communications between INTERMARKET and the Government.

13. As one example, by letter of March 23, 2005, INTERMARKET advised the Government:

> The above site [SUBHAN] building and equipment are now completed and ready for operation. However, we can not run our equipments for testing and commissioning in order to start production of ice cubes due to unavailability of electricity, water, and drainage systems. In accordance with contract agreement, KMOD will provide electric power, water supply and connection to drainage system.

14. The failure of KMOD to provide essential electrical power and water to the facilities continued to the date of contract termination, preventing the testing of the installed equipment, the testing of water, or the production of ice from ever being performed.

15. INTERMARKET has invested substantial amounts in the construction of the necessary plant and equipment, and in maintaining a labor force available to operate the plants when electrical power and water are ultimately provided. No compensation or payments have been provided to INTERMARKET for the construction of the production and storage facilities or for the labor costs incurred.

16. On July 26, 2005, Lt. Col. Craig Hill, USAF, was assigned by the Government to inspect the facilities constructed by INTERMARKET. He concluded:

> I certify that I visited and inspected all of the above sites on 26 July, 2005, with Master Sergeant Jun Tejada, escorted by the contractor, Mr. Qusay Al-Ateeqi. In addition to my earlier certification of 26 July, I add that we inspected the building at Subhan and certify that the building seemed well-built and that it appeared to be substantially complete.
>
> **It is my opinion that the contractor has done all he can at this plant until utilities are hooked up.** [emphasis added]

17. The Government recognized that the failure of KMOD to provide necessary electrical power and water was preventing performance of the Contract by INTERMARKET, and that INTERMARKET was incurring financial harm by the inability to recoup its investment. On September 3, 2005, the Government issued proposed bilateral Modification P00004 to the Contract which, if accepted, purported to implement a partial termination for convenience and provisional payment for a portion of the constructed facilities. Because of the inadequacy of the proposed payment, INTERMARKET declined to execute the Modification.

18. On September 28, 2005, the Government issued proposed bilateral Modification P00005 to the contract which cancelled the payment authority of Mod P00004. Mod P00005 purported to transfer immediately title to the production facilities at SUPCOM and SUBHAN, to pay INTERMARKET a specified amount for those facilities, and to thereafter have INTERMARKET operate the facilities as Government-furnished property.

19. Mod P00005 explicitly recognized that provision of electrical power and water was the responsibility of KMOD and that ice production could not commence until utilities were provided. Paragraph 5 of Mod P00005 provided in pertinent part:

> Full ice production (contract quantities) is based on Kuwaiti Ministry of Defence (KMOD) hookup of all utilities required to operate the ice production facilities and storage areas. Intermarket Overseas is hereby allowed a commissioning period of 30 days for initiation of full production and performance at the two ice production facilities (Subhan and Jahra) as well as the storage facilities from the date all utilities are hooked up.

20. INTERMARKET was directed either to accept and sign Mod P00005, or provide a letter setting forth its objections to the "proposal" in three days – by October 1, 2005. On October 1, 2005, INTERMARKET provided its objections to the proposed bilateral Modification and declined to execute the agreement.

21. On October 10, 2005, the Government issued a unilateral Modification P00006 to the Contract which purported to accomplish unilaterally under the Changes clause what INTERMARKET had declined to accept as a bilateral agreement in Mod P00004 and P00005. Among other things, INTERMARKET was directed by Mod P00006 to invoice specified amounts for the cost of ice production equipment and complete any remaining unfinished construction. INTERMARKET was to remain responsible for the maintenance and operation of the facilities.

22. Again, Mod P00006 expressly conditioned ice production on KMOD providing electrical power and water. Paragraph 4.b provided:

> **Full ice production (contract quantities) is contingent upon the Kuwaiti Ministry of Defence (KMOD) hookup of all utilities required to operate the ice production facilities and ice storage areas.** Intermarket Overseas is hereby allowed a commissioning period of 30 days for initiation of full production and performance at the two ice production facilities (Subhan and Jahra) as well as the storage facilities **from the date all utilities are hooked up.** During this commissioning period, KMOD shall accept and approve (or reject in writing) the facilities per the scope of work in the original contract. Notice to Proceed for full production shall be issued by the Contracting Officer after KMOD accepts the facilities. <u>"KMOD hookup" for the purposes of this Modification and performance of this contract</u> is defined as making utilities (power, sewage, and water) available at the plant site boundary with the available stubout location(s) for Intermarket Overseas to then make attachment connections at the utility stubout location(s) and run all necessary piping and cabling from the site boundary to the internal and external building connection(s). Intermarket Overseas shall be totally responsible for timely making any and all necessary connections from the boundary stubout locations to the buildings. [bolding added, underlining in original]

23. Mod P00006 further provided in paragraph 4.c that "Based on the utility hookup and completion of all facilities on or before November 1, 2005, the Contractor shall be responsible for full production effective 1 December 2005." Any delay in KMOD extending utilities to the sites after November 1, 2005, was to result in a day-for-day delay in the start of production, a reduction in the number of bags of ice to be produced, and a corresponding increase in the price per bag in accordance with a spreadsheet included as part of the Modification. The spreadsheet contemplated additional KMOD-caused delays of as much as five months for electrical power and water hookups, and for each day between November 1, 2005 and March 31, 2006, on which electrical power and water hookups might be completed, specified when ice production was to begin, the number of production days, and the price per bag of ice.

24. While acknowledging unequivocally KMOD's responsibility for supplying electrical power and water, and while providing for the contemplated resultant delays, Mod P00006 also contained ambiguous and completely contradictory directions purporting to preclude further schedule slippage. In an unnumbered paragraph following Paragraph 10, Mod P00006 also provided:

> YOU ARE HEREBY DIRECTED TO COMPLETE ALL REMAINING CONSTRUCTION AND FACILITY WORK WITHIN THE NEXT FIFTEEN DAYS (15 DAYS). IF YOU LEARN THAT KMOD UTILITIES WILL NOT BE AVAILABLE ON OR BEFORE 1 NOVEMBER 2005, YOU ARE DIRECTED TO IMMEDIATELY PROVIDE ME AN ALTERNATIVE COST PROPOSAL AND FEASIBILITY PLAN FOR INTERMARKET OVERSEAS TO EXTEND THE OFF SITE UTILITIES DISTRIBUTION SYSTEM TO THE PRODUCTION/STORAGE SITE BOUNDARIES NOT LATER THAN 1 NOVEMBER 2005. FURTHER DELAY IN COMPLETING ALL OF THE FACILITIES AND INITIATING PRODUCTION WILL NO LONGER BE TOLERATED OR EXCUSED AS ATTRIBUTABLE TO INACTION BY OTHERS. IF YOU FAIL TO IMMEDIATELY RESUME WORK AND MAKE PROGRESS SO AS TO ENSURE COMPLETION OF FACILITIES AND INITIAL PRODUCTION BEGINNING 1 NOVEMBER 2005, YOUR CONTRACT WILL BE TERMINATED FOR CAUSE IN ACCORDANCE WITH FAR 52.212-4(m) - Termination for Cause. TIME IS NOW OF THE ESSENCE AND FOREBEARANCE IN SCHEDULE SLIPPAGE WILL NO LONGER TO BE ALLOWED OR GRANTED.

25. INTERMARKET immediately undertook to meet the demands of Mod P00006 and again attempted to expedite KMOD utility hookups. Recognizing, however, that it was unlikely that KMOD utilities would be available by November 1, INTERMARKET also prepared an alternative cost proposal and feasibility plan for submission to the Government for substitute arrangements for obtaining electrical power and water. INTERMARKET was prepared to provide this proposal and plan within the required fifteen day period, and by letter of October 18, 2005, acknowledged receipt of Mod P00006, expressed its intent to fully comply, and advised the Government that it "anticipates submission of all stated requirements not later than 22 October 2005."

26. Without awaiting the expiration of the fifteen days, or the submission of the promised plan, the Contracting Officer on October 21, 2005, issued a Final Decision purporting to terminate the Contract for cause.

27. At the time of the Final Decision, none of the schedule deadlines established in Mod P00006 had arrived, and INTERMARKET was not in default of any requirement of the Contract.

28. At no time has INTERMARKET been in material default of any provision of the Contract, or failed to meet any schedule specified in the Contract other than by reason of an excusable delay.

29. The Government has retained without payment the property and equipment of INTERMARKET.

30. INTERMARKET has expended substantial sums in performance of the Contract and has received no payments for its performance from the Government.

**THIS ACTION**

31. INTERMARKET timely files this action contesting the Final Decision purporting to terminate the Contract for cause pursuant to 41 U.S.C. § 609(a).

**COUNT I**

32. The Clause entitled Termination for Cause in the Contract provides as follows:

> The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.

33. At the time of the purported termination for cause on October 21, 2005, the contract schedule was as modified in Mod P00006. That modification provided the following deadlines:

a. commencement of production of ice thirty days after the KMOD hookup of all utilities required to operate the ice production facilities and ice storage areas (which period had not yet commenced, much less concluded at the time of the Final Decision) and in any event no earlier than December 1, 2005; and

b. submission of an alternative cost proposal and feasibility study for provision of electrical power and water, which was due on October 25, 2005.

Neither of these dates had arrived as of the time of termination, and thus these schedule provisions provide no justification for the termination.

34. At the time of the purported termination for cause on October 21, 2005, INTERMARKET had fully completed construction and installation of the ice production and storage facilities except for those activities such as testing and charging of the equipment with refrigerant that required electrical power or water to complete.

35. At the time of the purported termination for cause on October 21, 2005, INTERMARKET was neither delinquent nor in default of any provision of the Contract.

36. There is no basis for termination for cause under the terms of the Contract.

## COUNT II

37. The Clause entitled Excusable Delays in the Contract provides as follows:

> The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence. . . .

38. At no time from execution of the Contract until termination did KMOD provide required electrical power or water to the INTERMARKET facilities.

39. The failure of KMOD to provide electrical power or water to the INTERMARKET facilities was beyond the reasonable control of Contractor and without its fault or negligence.

40. In addition to being an explicit condition for production of ice under the Contract, the failure of KMOD to provide electrical power and water to the INTERMARKET facilities constitutes an excusable delay under the Contract.

## COUNT III

41. The provision of electrical power and water to the INTERMARKET facilities is a condition precedent to INTERMARKET's obligation to produce or deliver ice.

42. The failure of that condition precedent excuses any failure to perform by INTERMARKET under the Contract.

## COUNT IV

43. The Contract delivery schedule was waived upon the Government's failure to take action when ice was not produced or delivered six months from June 1, 2004, as established in Modification P00002.

44. No Contract delivery schedule was ever validly re-established.

45. There is no Contract delivery schedule against which INTERMARKET can be deemed to be in default.

## COUNT V

46. The unilateral deadlines purported to be imposed by Modification P00006, including, *inter alia*, (a) the fifteen day deadline for providing an alternative cost proposal and feasibility plan; (b) the thirty day deadline after provision of electrical power and water for commencement of production; (c) the purported requirement to extend the off site utility

distribution system to the production/storage site boundaries not later than November 1, 2005; and (4) the purported requirement to commence initial production beginning November 1, 2005, regardless of KMOD provision of utilities, are unreasonable and invalid, and cannot provide the basis for a termination for cause.

**COUNT VI**

47. The purported unilateral modifications to the terms and conditions of the Contract presented in Modification P00006, including *inter alia* the attempt to shift responsbility for provision of electrical power and water to INTERMARKET, are beyond the scope of the Changes clause of the Contract and are invalid.

**COUNT VII**

48. The failure to provide water and electrical power to the INTERMARKET facilities is a breach by the Government of its duty of cooperation and of good faith and fair dealing under the Contract.

**COUNT VIII**

49. INTERMARKET is not in material default or breach of the Contract.

WHEREFORE, for the reasons set forth above, INTERMARKET prays for relief as follows:

1. That the Court declare that the purported termination for cause of Contract No. N49400-04-C-A017 is invalid.

2. That the Court convert the purported termination for cause to a termination for convenience entitling INTERMARKET to a termination settlement.

3. That the Court determine that INTERMARKET has no liability to the United States for any damages, excess reprocurement costs, or otherwise for default of the Contract.

4. That the Court deny the claims of the Government against INTERMARKET asserted in the Final Decision.

5. That the Court award costs, attorney fees, and such other and further relief as the Court may deem just and equitable in the circumstances.

Respectfully submitted,

Alan C. Brown
DUANE MORRIS LLP
1667 K Street N.W., Suite 700
Washington, DC 20006-1608
(202) 776-7893
(202) 776-7801 (fax)

Attorney of Record for
INTERMARKET OVERSEAS FOR
GENERAL TRADING, EST.

Dated: January 20, 2006

WSH\35151 2.1